J-A24032-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| REGINALD TEASLEY | : | |
| | : | |
| Appellant | : | No. 2624 EDA 2023 |

Appeal from the Judgment of Sentence Entered September 6, 2023
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0008661-2022

BEFORE: LAZARUS, P.J., KING, J., and LANE, J.

MEMORANDUM BY LANE, J.: **FILED APRIL 22, 2025**

Reginald Teasley ("Teasley") appeals from the judgment of sentence imposed following his convictions of aggravated assault, graded as a first-degree felony, and simple assault and recklessly endangering another person ("REAP"), both graded as second-degree misdemeanors.[1] After careful review, we reverse the aggravated assault conviction, vacate the judgment of sentence imposed for each of these counts, and remand to the trial court for resentencing.

We summarize the trial testimony. At approximately 2:00 a.m. on November 2, 2022, Teasley returned to his family home in Philadelphia. Teasley walked past his sixty-four-year-old father, Reginald Teasley, Senior, who was sleeping on the couch, and into the kitchen to heat up food in the microwave. Once Teasley took the food out of the microwave, his father

_____

[1] **See** 18 Pa.C.S.A. §§ 2702(a)(1), 2701(a)(1), 2705.

confronted him for returning home late at night, making noise, eating his father's food, and "not paying nothing." N.T., 7/13/23, at 17-18. When Teasley asked his father what he was talking about, his father knocked Teasley's food "upward" and out of his hand. *Id*. at 18-19, 37. In response, Teasley grabbed his father under the armpits, "like a football grab," picked his father up, and pushed him backwards. *Id*. at 19, 21, 39. Teasley's father's back hit the counter, and his head "went back" into the upper, glass-fronted kitchen cabinet, shattering its glass. *Id*. at 22. This caused Teasley's father's head to bleed. Teasley did not assist his father and instead went upstairs.

Thereafter, Teasley's father used a rag to contain the bleeding, and he walked to the emergency room. His treatment included the removal of glass from his head, as well as three staples and four stitches to close two cuts, two and three centimeters in length, respectively.[2] Police visited Teasley's father in the hospital, whereupon he informed them that Teasley caused his injuries. The Commonwealth charged Teasley with aggravated assault, simple assault, and REAP.

On July 13, 2023, the trial court conducted a non-jury trial, during which both Teasley and his father testified. Teasley's father stated that at the time of the attack, he suffered from multiple chronic injuries which caused him to "live with pain every day." N.T., 7/13/23, at 16, 29-30. He clarified, however,

---

[2] Due to the nature of the wounds, Teasley's father had to return to the hospital multiple times to remove bits of shattered glass as they surfaced during the healing process.

that that he did not "tell nobody about [his] pain or [his] sickness." *Id*. at 30. In describing their size difference, Teasley's father testified that his son is "a bit taller[,] a lot heav[ier], [and] a lot stronger." *Id*. at 31. Finally, Teasley's father testified that although he believed his son was angry at the time, he did not believe his son "meant" for his head to contact and shatter the upper glass cabinet. *Id*. at 19, 21-22, 39.

The trial court found Teasley guilty of aggravated assault, simple assault, and REAP. At the sentencing hearing on September 6, 2023, the trial court stated that it would impose a mandatory minimum sentence for aggravated assault against an elderly person pursuant to 42 Pa.C.S.A. § 9717(a).[3] *See* N.T., 9/6/13, at 30. The trial court then imposed a sentence of three to six years' incarceration for aggravated assault, and a consecutive three years' probation for REAP.[4] Teasley did not file any post-sentence motions. Teasley filed a timely notice of appeal, and both he and the trial court complied with Pa.R.A.P. 1925.

Teasley presents the following issues for our review:

1. Was the evidence insufficient to find [Teasley] guilty of aggravated assault in that the evidence failed to prove that [Teasley] attempted to cause, or intentionally, knowingly or recklessly caused, serious bodily injury to his father under

---

[3] *See* 42 Pa.C.S.A. § 9717(a) (stating that a person convicted of aggravated assault shall be subject to a mandatory two-year minimum term of imprisonment if, at the time of the assault, he is less than, and the victim is over, sixty years of age).

[4] For sentencing purposes, Teasley's conviction for simple assault merged with his conviction for aggravated assault.

circumstances manifesting extreme indifference to the value of human life?

2. Was the evidence insufficient to find [Teasley] guilty of [REAP] in that the evidence failed to prove that [Teasley] recklessly engaged in conduct which placed his father in danger of death or serious bodily injury?

3. Did the trial court err and abuse its discretion in imposing a sentence pursuant to 42 Pa.C.S.A. § 9717 where [Teasley] had no notice prior to sentencing that a mandatory sentence pursuant to this statute would be imposed, where the respective ages of [Teasley] and his father were never alleged in any charging document or designated as additional facts required to be proven at trial, and where the court *sua sponte* applied the statute without any expression by the Commonwealth of an intent to invoke the statute?

4. Did the trial court impose an illegal sentence of three years' probation for the offense of [REAP], a misdemeanor of the second degree, in that the sentence imposed exceeded the maximum sentence for a misdemeanor of the second degree?

Teasley's Brief at 3-4.

In his first two issues, Teasley challenges the sufficiency of the evidence underlying his convictions for aggravated assault and REAP. A challenge to the sufficiency of the evidence presents a question of law for which our standard of review is *de novo* and our scope of review plenary. ***See Commonwealth v. Headley***, 242 A.3d 940, 943 (Pa. Super. 2020). When considering a challenge to the sufficiency of the evidence:

[W]e evaluate the record in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Nevertheless, the Commonwealth need not establish guilt to a mathematical

- 4 -

certainty. Any doubt about the defendant's guilt is to be resolved by the fact finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances.

The Commonwealth may sustain its burden by means of wholly circumstantial evidence. Accordingly, [t]he fact that the evidence establishing a defendant's participation in a crime is circumstantial does not preclude a conviction where the evidence coupled with the reasonable inferences drawn therefrom overcomes the presumption of innocence. Significantly, we may not substitute our judgment for that of the fact finder; thus, so long as the evidence adduced, accepted in the light most favorable to the Commonwealth, demonstrates the respective elements of a defendant's crimes beyond a reasonable doubt, the appellant's convictions will be upheld.

*Commonwealth v. Franklin*, 69 A.3d 719, 722-23 (Pa. Super. 2013) (citations and quotation marks omitted).

A person is guilty of aggravated assault if he, *inter alia*: (1) "attempts to cause serious bodily injury to another;" or (2) "causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life[.]" 18 Pa.C.S.A. § 2702(a)(1). Our Crimes Code defines serious bodily injury as "[b]odily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." 18 Pa.C.S.A. § 2301. "Where the victim does not suffer serious bodily injury, the charge of aggravated assault can be supported only if the evidence supports a finding of an attempt to cause such injury." *Commonwealth v. Fortune*, 68 A.3d 980, 985 (Pa. Super. 2013) (*en banc*) (citation omitted).

To determine whether a defendant possessed the specific intent to cause serious bodily injury, our Supreme Court in *Commonwealth v. Alexander*, 383 A.2d 887 (Pa. 1978), created a totality of the circumstances test that we apply on a case-by-case basis. Pertinently, our Supreme Court provided a non-exhaustive list of factors that we may consider to determine whether a defendant intended to inflict serious bodily injury by one blow, including: (1) evidence "the defendant was disproportionately larger or stronger than the victim;" (2) "whether the defendant would have escalated his attack but was restrained from doing so;" (3) the defendant's use of a weapon or other implement to aid his attack; and (4) the defendant's statements before, during, or after the attack which might indicate his intent to inflict injury. *Commonwealth v. Gibson*, 318 A.3d 927, 936 (Pa. Super. 2024); *see also Alexander*, 383 A.2d at 887. Our Supreme Court has clarified that aggravated assault is "the functional equivalent of a murder in which, for some reason, death fails to occur." *Commonwealth v. O'Hanlon*, 653 A.2d 616, 618 (Pa. 1995).

In *Alexander*, the victim was standing on the sidewalk when he "saw something coming toward his head and then was struck once in the face by [the defendant], using a closed fist. The victim fell to the ground but never lost consciousness," and the defendant walked away. *Alexander* 383 A.2d at 888. "[The victim] was taken to an emergency ward where he was treated for" a broken nose. *Id*. The trial court found the defendant guilty of aggravated assault, and this Court affirmed the conviction on appeal. *See id*.

Our Supreme Court reversed, finding the Commonwealth's evidence was insufficient to support aggravated assault. *See id*. The Supreme Court reasoned that although the defendant's punch targeted a physiologically vital part of the body, this, "without more," was not enough to support a finding of intent to inflict serious bodily injury. *Id*. at 889. Relevantly, the only direct evidence of the defendant's intent was his testimony that he did not intend to seriously injure the victim. *See id*. Thus, the Supreme Court examined the circumstances surrounding the attack for evidence that he did. *See id*. In doing so, it determined the defendant did not intend to inflict serious bodily injury, as he: (1) was not "disproportionately larger or stronger than the victim;" (2) "was not restrained from escalating his attack upon the victim;" (3) did not use a "weapon or other implement to aid his attack;" and (4) "made no statements before, during, or after the attack which might indicate his intent to inflict further injury upon the victim." *Id*.

In **Commonwealth v. Burton**, 2 A.3d 598 (Pa. Super. 2010) (*en banc*), the fifty-one-year-old victim was with his friend on a street in Philadelphia when the defendant began yelling at him, "You're going to give me my money, you're going to give me my money." *Id*. at 599-600 (brackets omitted). Although the victim admitted to owing the defendant money, he informed the defendant "that he did not have the required cash" to pay the defendant "all of his money immediately." *Id*. at 600. "At that point, [the defendant] came running over to the victim and [his friend] and acted like he was getting ready to hit the victim." *Id*. (quotation marks omitted). Although the victim stated

he was not afraid of the defendant, the defendant responded, "All right, wait until we get at the end of the block." *Id*. (brackets omitted).

The three men walked to the end of the block, where the victim "knew that he and the defendant were going to engage in a fistfight." *Id*. at 600, 603. At that time, both the victim and the defendant asked the victim's friend to "move away." *Id*. at 604. However, the defendant did not wait until the victim's friend was fully out of harm's way before he preemptively delivered a single punch to the victim, who "was unprepared for the blow" and "had his hands behind his back." *Id*. The victim lost consciousness and "fell headfirst to the pavement." *Id*. The defendant did not continue the assault but instead sat "in the middle of the street," observed the victim's bleeding and convulsing body, smiled, and laughed as he stated, "I got you, I got you, I told you I was going to get you." *Id*. at 600. Following a nonjury trial, the trial court found the defendant guilty of aggravated assault. *See id*. at 601.

On appeal, an *en banc* panel of this Court found, and the defendant conceded, that the victim suffered serious bodily injury. *See id*. at 603. Accordingly, the defendant argued that he lacked the intent to inflict such harm. *See id*. This Court applied *Alexander* and determined that the circumstances surrounding the defendant's isolated punch established sufficient evidence that he intended to cause serious bodily injury. *See id*. Pertinently: (1) the defendant was ten years younger and "significantly stronger and larger than" the victim; and (2) his "actions and statements before and after the assault confirm[ed] that he intended to inflict the victim's

injuries." *Id*. This Court emphasized that the defendant "aggressively initiated a confrontation with" the victim, and that the defendant's "gleeful remarks" following the assault indicated his intent to cause the victim serious bodily injury. *Id*. Further, although the defendant argued that he did not intend to inflict serious bodily injury, as he did not continue the assault after the single punch, our Court dismissed this claim. *Id*. at 604. In doing so, we reasoned that "the immediately-evident severity of the victim's harm [made it] apparent that [the defendant] did not need to proceed further with his attack[.]" *Id*.

In his first issue, Teasley argues that the evidence was insufficient to support his conviction for aggravated assault. Initially, he maintains that the two cuts his father sustained to his head did not constitute serious bodily injury, as there was no evidence that they caused serious, permanent disfigurement or created a substantial risk of death. To further support this claim, he relies on three Superior Court decisions from the early 1980s: (1) *Commonwealth v. Cavanaugh*, 420 A.2d 674 (Pa. Super. 1980) (holding that although the defendant possessed an intent to inflict serious bodily injury, such injury did not exist where the defendant struck the victim's head with a tire iron, causing lacerations requiring nine stitches); (2) *Commonwealth v. Aycock*, 470 A.2d 130 (Pa. Super. 1983) (relying on *Cavanaugh* to hold that a defendant attempted to cause serious bodily injury when he struck the victim's head with a piece of steel, causing cuts requiring twenty-seven sutures); and (3) *Commonwealth v. Pandolfo*, 446 A.2d 939 (Pa. Super.

1982) (holding a police officer did not suffer serious bodily injury when the defendant "struck him several times on his face and head, and slashed his face with a pocketknife," causing injuries that required ten sutures).

Additionally, Teasley argues that even if these injuries did constitute serious bodily injury, he did not intentionally, knowingly, or recklessly cause them under circumstances manifesting extreme indifference to the value of human life. Initially, Teasley claims that the record did not support the trial court's assertion, that he "lifted and threw his elderly father into an upper glass cabinet." Teasley's Brief at 16. Although Teasley concedes that his father stated that he "pick[ed him] up like that," he points out that his father clarified that Teasley's physical action "was like pushing, like a push." *Id*. at 16-17. As such, he argues he did not "bodily toss[] his father into the cabinet," but instead only pushed his father backwards. *Id*. at 17.

Teasley also challenges the trial court's finding that he was aware of his father's pre-existing health conditions, as it was contrary to Teasley's father's testimony that he did not "tell nobody about [his] pain or . . . sickness." *Id*. at 17-18. Lastly, Teasley maintains the trial court's finding that he "fled to his upstairs room after the incident, 'leaving his wounded father to tend to his injuries and walk alone to the hospital,'" is similarly unsupported. *Id*. at 18. Teasley elaborates "there was no evidence that [he] was aware of the extent of his father's injuries or that he consciously refused to help his father and thereby forced his father to walk to the hospital alone to seek treatment." *Id*.

Absent these findings, Teasley avers he did not act intentionally, knowingly, or recklessly as "the evidence [only] showed that, in reaction to having his food knocked out of his hand by his father, [Teasley] pushed his father back, **_inadvertently_** causing his father to sustain cuts on his head." **_Id_**. at 19. Moreover, Teasley asserts "the only true evidence of [his] intent came from the testimony of his father, when [his father] said of [Teasley], 'I don't think he meant to do it.'" **_Id_**. at 20. In support, Teasley relies on this Court's holding in **_Commonwealth v. Magnelli_**, 502 A.2d 241 (Pa. Super. 1985), that the defendant did not act recklessly under circumstances manifesting an extreme indifference to human life when he picked up and threw a police officer into nearby concrete steps, causing serious bodily injury.

Teasley argues that even if his actions were reckless, he did not act under circumstances manifesting extreme indifference to the value of human life. He highlights that the degree of malice required for the reckless commission of aggravated assault is the functional equivalent of that for a murder in which, for some reason, death fails to occur. As such, Teasley claims the instant record "does not establish that he held such a state of mind when he pushed his father." **_Id_**. at 22.

Lastly, Teasley contends that the evidence was insufficient to show he attempted to cause his father serious bodily injury. Relying on the test in **_Alexander_**, Teasley acknowledges there was testimony that he was bigger, stronger, and taller than his father. However, he emphasizes there was no evidence that he demonstrated an intent, before or after the push, to cause

- 11 -

his father serious bodily injury. Teasley highlights that: (1) his actions were not pre-meditated, but spontaneous as they occurred following his father's provocation; (2) he did not precede the push with any threat to cause his father harm; (3) he did not direct force against a vital part of his father's body; and (4) he retreated to his room immediately following the altercation. Thus, Teasley argues that because the evidence was insufficient to prove that he either caused his father serious bodily injury, or that he attempted to cause his father such injury, the trial court erred in finding him guilty of aggravated assault.

The trial court concluded Teasley's sufficiency claim lacked merit, reasoning as follows:

> The court found [Teasley] possessed clear intent to cause serious bodily injury when he lifted and threw his elderly father into an upper glass cabinet. [Teasley] was familiar with the kitchen layout, specifically, the location and placement of the cabinets and counter. He was angry and his behavior was intentional, knowing, and reckless, under the circumstances, manifesting an extreme indifference to the value of his father's life, given the age of his father (mid 60's) and his pre-existing conditions. Following the attack, [Teasley] took respite [in] his room, leaving his wounded father to tend to his injuries and walk alone to the hospital. [Teasley's] lack of empathy, remorse, and failure to assist his father following this brutal incident shows an extreme indifference to human life.

Trial Court Opinion, 11/27/23, at 4-5 (citations and unnecessary capitalization omitted).

After careful review of the record, in the light most favorable to the Commonwealth as the verdict winner, we conclude the trial court erred in

- 12 -

finding the evidence sufficient to establish aggravated assault. **_See Franklin_**, 69 A.3d at 722-23. Preliminarily, we conclude that Teasley did not cause his father serious bodily injury, as there was no evidence that the two cuts to his father's head created a substantial risk of death, or caused serious and permanent disfigurement, or any protracted loss or impairment of the function of a bodily member or organ. **_See_** 18 Pa.C.S.A. § 2301. Accordingly, Teasley's conviction for aggravated assault relies upon whether there was sufficient evidence to show that, by pushing his father, he attempted to inflict serious bodily injury. **_See_** 18 Pa.C.S.A. § 2702(a)(1); **_see also Fortune_**, 68 A.3d at 985.

Here, the only factor that met our Supreme Court's test in **_Alexander_** was that Teasley was larger and stronger than his father. Notably, our review shows that Teasley did not: (1) use a weapon against his father; (2) escalate the attack against his father, although he was unrestrained from doing so; or (3) make any statements to his father before, during, or after the push which might indicate an intent to inflict further injury. We further note that it was Teasley's father who initiated the confrontation by approaching Teasley in the kitchen and knocking a plate of food out of Teasley's hands. Lastly, we emphasize that Teasley's father testified that he did not believe Teasley intended to cause his head to hit the upper glass cabinet.

Given this analysis, we find the instant case is distinguishable from **_Burton_**. Unlike the defendant in **_Burton_**, Teasley was not the aggressor, did not catch his father by surprise, did not make any threatening statements

before, during, or after the altercation, and did not revel in his father's injuries, but instead immediately went to his room. Although **Burton** is similar in that the defendant in that case also did not escalate his attack following his isolated physical act, the victim in that case sustained visible serious bodily injury. We reiterate that although Teasley's father was visibly bleeding from his head, he remained conscious and able to walk to the hospital.

Instead, we determine Teasley's actions more closely resembled those of the defendant in **Alexander**. Just as the defendant in that case delivered an isolated, weaponless punch to the head of the victim before walking away, here Teasley delivered an isolated, weaponless push against his father's chest before going to his room. Similarly, neither the defendant in **Alexander**, nor Teasley in the instant case, made any statements before, during, or after their respective attack, evidencing any intent to inflict further injury.

Thus, in light of Teasley's father's testimony that Teasley did not mean to cause his father's injuries, we conclude that Teasley's isolated, weaponless push was not the functional equivalent of a failed attempt to kill his father. **See O'Hanlon**, 653 A.2d at 618. Accordingly, we reverse Teasley's conviction for aggravated assault and vacate the judgment of sentence.

In his second issue, Teasley argues the evidence was insufficient to support his conviction for REAP. A person is guilty of REAP "if he recklessly engages in conduct which places or may place another person in danger of death or serious bodily injury." 18 Pa.C.S.A. § 2705. "The reckless mental state required for [REAP] has been defined as a conscious disregard of a

known risk of death or great bodily harm to another person. REAP requires the creation of danger, so the Commonwealth must prove the existence of an actual present ability to inflict [such harm]." **Commonwealth v. Brockington**, 230 A.3d 1209, 1215 (Pa. Super. 2020) (citations and quotation marks omitted).

Teasley argues that the evidence was insufficient to support his conviction for REAP, as the Commonwealth failed to show that he consciously disregarded an unjustifiable risk that his father would suffer death or a serious bodily injury when he pushed his father backwards. Preliminarily, Teasley concedes that his push had the potential to cause his father bodily injury, as such injury did occur. However, he avers that the circumstances surrounding the push do not show that he understood, "but disregarded, the real possibility that his father would suffer death" or serious bodily injury as a result. Teasley's Brief at 27.

The trial court determined the evidence was sufficient to support Teasley's conviction for REAP, reasoning as follows:

> The court found [Teasley] guilty of [REAP] for the same conduct related to the charge of aggravated assault. [Teasley] demonstrated reckless behavior by throwing his father into a glass cabinet. He placed the victim in eminent danger once the glass cabinet shattered, and shards of glass were lodged in the father's head. [Teasley's] immediate ability to inflict harm was evidenced by his awareness of his father's elderly status, their differences in size, and the victim's pre-existing health conditions all which made him more vulnerable to death or serious bodily injury.

Trial Court Opinion, 11/27/23, at 5 (citations and unnecessary capitalization omitted).

After reviewing the record in the light most favorable to the Commonwealth as the verdict winner, we determine the evidence supports Teasley's conviction for REAP. *See Franklin*, 69 A.3d at 722-23. Here, when Teasley pushed his sixty-four-year-old father, he was aware that he was significantly larger and stronger, and that his father was standing in front of a glass kitchen cabinet. This evidence was sufficient to support the inference that when Teasley picked up and pushed his father backwards, he consciously disregarded the known risk that these actions could result in his father hitting the glass-fronted cabinet and sustaining serious bodily injury. *See Brockington*, 230 A.3d at 1215.

Although we determined *supra* that Teasley's father's injuries did not constitute serious bodily injury, we emphasize that the Commonwealth needed only prove that Teasley *may* have placed his father in danger of sustaining such injury. *See* 18 Pa.C.S.A. § 2705. Here, the result of Teasley's push was his father's head hitting and shattering a glass-fronted cabinet. This evidence was sufficient to support Teasley's conviction for REAP. Thus, we hold Teasley's second issue is without merit.

In his third issue, Teasley challenges the legality of the sentence imposed for his conviction for aggravated assault. However, because we reversed this conviction and vacated Teasley's judgment of sentence for this count, we do not address this issue.

- 16 -

In his final issue, Teasley challenges the legality of the sentence imposed for his conviction of REAP. Our standard of review from a challenge to the legality of a sentence is as follows:

A claim that the trial court erroneously imposed an illegal sentence is a question of law and, as such, our scope of review is plenary and our standard of review is *de novo*. If no statutory authorization exists for a particular sentence, that sentence is illegal and subject to correction. An illegal sentence must be vacated. Moreover, challenges to an illegal sentence can never be waived and may be reviewed *sua sponte* by this Court.

***Commonwealth v. Whalley***, 326 A.3d 948, 950 (Pa. Super. 2024) (citations and quotation marks omitted).

A trial court shall not sentence a person convicted of a second-degree misdemeanor to more than two years' imprisonment. ***See*** 18 Pa.C.S.A. § 1104(2). Applying this statute, our Court has held that the imposition of a three-year probationary sentence for a second-degree misdemeanor conviction was illegal as it exceeded the statutory two-year sentencing maximum. ***See Commonwealth v. White***, 335 A.2d 436, 440 (Pa. Super. 1975).

Teasley argues that the trial court's imposition of a three-year probationary term for his conviction for REAP is illegal as it exceeded the two-year statutory maximum for second-degree misdemeanors. Accordingly, Teasley asks this Court to vacate his sentence for this count.

In its Rule 1925(a) opinion, the trial court also determined that the three-year sentence for Teasley's REAP conviction violated the two-year

statutory maximum sentence for second-degree misdemeanors. **See** Trial Court Opinion, 11/27/23, at 8-9.

After review, we similarly determine that Teasley's sentence for REAP is illegal.[5] As Teasley's conviction for REAP is a second-degree misdemeanor, the trial court could not have sentenced him to a term in excess of the two-year statutory maximum. **See** 18 Pa.C.S.A. § 1104(2). Thus, we vacate his judgment of sentence for this count. **See Whalley**, 326 A.3d at 950; **see also White**, 335 A.2d at 440.

Because our disposition disrupts the overall sentencing scheme of the trial court, we vacate Teasley's judgment of sentence in its entirety and remand for resentencing. **See Commonwealth v. Tanner**, 61 A.3d 1043, 1048 (Pa. Super. 2013).

Conviction for aggravated assault reversed. Judgment of sentence vacated. Case remanded for resentencing. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 4/22/2025

---

[5] Although Teasley did not challenge the legality of his sentence in a post-sentence motion, we reiterate that "challenges to an illegal sentence can never be waived[.]" **See Whalley**, 326 A.3d at 950.

- 18 -